Michael & Lauri LEWINSKI, Individually and on behalf of their minor daughter, Heather Lewinski, Petitioners,

v.

COMMONWEALTH of Pennsylvania, The Medical Professional Catastrophe Loss Fund, and, John Reed, Director, Respondents.

Commonwealth Court of Pennsylvania.

Argued May 3, 2004.
Decided July 1, 2004.

John P. Gismondi, Pittsburgh, for petitioners.

Guy A. Donatelli, West Chester, for respondents.

BEFORE: McGINLEY and PELLEGRINI, JJ., and KELLEY, Senior Judge.

OPINION BY Judge McGINLEY.

Michael and Lauri Lewinski, individually and on behalf of their minor daughter, Heather Lewinski (Petitioners), filed a complaint against the Commonwealth of Pennsylvania, the Medical Professional Liability Catastrophe Loss Fund (CAT Fund), and its Director, John Reed,[1] for declaratory judgment in this Court's original jurisdiction pursuant to 42 Pa.C.S. § 761.[2] The Petitioners seek a declaration from this Court that the CAT Fund's refusal to provide coverage on behalf of a professional corporation violates: (1) the former Health Care Services Malpractice Act, 40 P.S. §§ 1301.101–1301.1004 (the Malpractice Act)[3], (2) the common law principles of estoppel and laches, and (3) the equal protection clause of the United States Constitution.

Presently before this Court are the cross-motions for summary judgment filed by Petitioners and the CAT Fund.[4]

---

1. By stipulation of the parties, the complaint against John Reed was withdrawn.

2. *See also Willet v. Pennsylvania Medical Catastrophe Loss Fund*, 549 Pa. 613, 702 A.2d 850 (1997) (the Commonwealth Court has exclusive jurisdiction to hear cases involving the CAT Fund, an agency of the Commonwealth).

3. Act of October 15, 1975, P.L. 390, *as amended*, 40 P.S. §§ 1301.101–1301.1004. In 2002, the Malpractice Act was repealed and replaced by the Medical Care Availability and Reduction Act (MCare Act), Act of March 20, 2002, P.L. 154, *as amended*, formerly 40 P.S. §§ 1303.101–1303.910.

4. Pennsylvania Rule of Civil Procedure No. 1035(a) provides "[a]fter the pleadings are closed, but within such time as not to delay trial, any party may move for summary judgment on the pleadings and any depositions, answers to interrogatories, admissions on file and supporting affidavits." In *Geriot v. Council of the Borough of Darby*, 73 Pa.Cmwlth. 1, 457 A.2d 202, 203 (1983), our Court reiterated the following standards for entry of a summary judgment: 1) the case must be clear and free from doubt; 2) the moving party must prove that there is no genuine issue of materi-

In 1998, suit was filed against Dennis Hurwitz, M.D. (Dr. Hurwitz) and Dennis J. Hurwitz, M.D., P.C. (professional corporation), centered on allegations that Dr. Hurwitz negligently performed plastic surgery on Heather Lewinski, then 8 years old, which left her with permanent facial scarring. On July 16, 1998, the Petitioners filed a medical malpractice action in the Court of Common Pleas of Allegheny County which asserted a direct claim against Dr. Hurwitz and a vicarious liability claim against his professional corporation. The complaint was based on alleged acts of negligence which took place more than four years prior to the filing of the complaint.

Because Petitioners filed their lawsuit more than four years from the date of the malpractice, Former Section 605 of the Malpractice Act[5] applied. Pursuant to this Section, the CAT Fund assumed the defense of both Dr. Hurwitz and his professional corporation. The case was tried before a jury and on May 25, 2001, a verdict was recorded in favor of Petitioners' daughter in the amount of $3,000,000 and in favor of Petitioners in the amount of $550,000.[6] By agreement of the parties,

the verdict was molded to include both Dr. Hurwitz and his professional corporation.

On December 31, 2002, the CAT Fund paid its statutory $1 million, plus delay damages and post judgment interest to Petitioners for a total payment of $1,200,958 on behalf of Dr. Hurwitz. The CAT Fund refused, however, to pay or satisfy any portion of the verdict on behalf of the professional corporation.

The CAT Fund's refusal was based on its contention that the professional corporation had not obtained "separate basic coverage" and, as such, was not entitled to the CAT Fund's $1 million excess coverage under Section 701 of the Malpractice Act, 40 P.S. § 1301.701.

In 1993, the relevant occurrence year, the Physicians Insurance Company (PIC) issued a basic coverage policy of professional liability insurance to Dr. Hurwitz, individually, for the policy period January 1, 1994, to January 1, 1995.[7] The limit of liability for this basic coverage policy was $200,000 per occurrence and $600,000 annual aggregate, the mandatory primary limits at that time under Section 701 of the Malpractice Act.[8] PIC charged Dr. Hurwitz an annual premium of $15,529, which

---

al fact to be tried and that it is entitled to judgment as a matter of law; and 3) the record must be viewed in the light most favorable to the nonmoving party and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

5. Pursuant to former Section 605, formerly 40 P.S. § 1301.605, the CAT Fund acted as *primary* coverage for professional liability claims that were filed more than four years after the tort occurred if filed within the applicable statute of limitations. Former Section 605 provides, in part, as follows:

> Statute of limitations. All claims for recovery pursuant to this act must be commenced within the existing applicable statutes of limitation. In the event that any claim is made against a health care provid-

er subject to the provisions of Article VII more than four years after the breach of contract or tort occurred which is filed within the statute of limitations, such claim shall be defended and paid by the fund....

6. With the addition of delay damages, the total amount of the award was $4,263,404.

7. PIC became insolvent on January 21, 1998.

8. Under former Section 701 of the Act, formerly 40 P.S. § 1301.701, each physician who practiced medicine in Pennsylvania was required to obtain primary or basic coverage in certain mandated limits in order to practice medicine in Pennsylvania. For the year of the malpractice here, 1994, the mandatory primary limits were $200,000 per occurrence per physician.

included a mandatory surcharge to the CAT Fund.[9]

At the same time, and for the same policy period, PIC issued a separate policy to Dr. Hurwitz's professional corporation.[10] The policy included the same limits of liability of $200,000 of basic coverage, and $600,000 annual aggregate. PIC did not charge an additional premium for corporate coverage.[11]

The parties do not dispute that there were two separate policies issued; one to the doctor and another to his professional corporation, *or* that the text of the policies are identical. The parties also do not dispute that the PIC policies issued to Dr. Hurwitz and his professional corporation created a controversial "shared limits" scenario, whereby the coverage available to the professional corporation (Coverage B) was reduced or limited by the extent of the coverage paid on behalf of the physician (Coverage A). Because under such a policy, the physician and his professional corporation *shared* the same liability limit, the most PIC would pay under the "shared

limits" policy was an amount equal to the maximum basic coverage under *one* of the policies. In other words, if the physician's coverage limit was applied to the loss, then the professional corporation did not have additional separate independent coverage for the same loss. The professional corporation's purported coverage was rendered illusory or non-existent.[12]

The provisions of the policy issued by PIC to the corporation relevant to the parties' positions read as follows:

### INSURING AGREEMENT: OCCURRENCE COVERAGE

Subject to the terms, conditions and exclusions contained herein the Company will pay on behalf of the Insured the amounts, up to the limits of liability set forth in this policy for which the Insured shall become legally obligated to pay as damages arising out of an Occurrence resulting in Injury to any person that takes place during the policy period, because of:

---

9. Section 701 of the Act, formerly 40 P.S. § 1301.701, provided health care providers an additional layer of excess coverage in the amount of $1 million per occurrence provided through the CAT Fund, an executive agency which was created for the purpose of paying claims against participating health care providers for damages awarded in medical malpractice actions against them in excess of the basic insurance coverage required by the Act. The CAT Fund was funded by levying an annual surcharge on all health care providers in an amount to be determined by the Director of the CAT Fund. Formerly 40 P.S. § 1301.701(e). The CAT Fund was replaced in 2002 with the Medical Care Availability and Reduction of Error Fund. Formerly 40 P.S. § 1303.712.

10. In 1978, Section 811(d) of the Act, formerly 40 P.S. § 1303.811(d), was added to permit professional corporations to obtain basic insurance coverage and pay the annual surcharge required by Section 701(e), formerly 40 P.S. § 1301.701(e), in which case the pro-

fessional corporation would be entitled to excess coverage from the CAT Fund as provided for in Section 701, formerly 40 P.S. § 1301.701.

11. As a marketing strategy, PIC issued corporate coverage at no charge provided that all physicians employed by the corporation were PIC insureds. See *letter dated October 27, 1992, from Charles Lederman of PIC to Patrick Musiak of PA Insurance Department*; Exhibit "C" to Petitioners' Motion for Summary Judgment at 17–18.

12. PIC's explanation for the revision to its policies was to avoid having to pay a plaintiff twice for a single act of negligence involving a corporation's employee, where the corporation was sued on a vicarious liability/*respondeat superior* theory of liability. See letter dated August 30, 1993, to B. Craig Black, Acting Chief Counsel of CAT Fund from Lawrence G. McMichael, counsel for PIC; Exhibit "C" to Petitioners' Motion for Summary Judgment at 43–49.

. . . .

Coverage B—Association, Corporation or Partnership Liability:

Injury arising out of the rendering of or failure to render professional health care services by a person for whose acts or omissions the Insured association, corporation or partnership is legally responsible. *The limits available under Coverage B are excess of all other valid and collective insurance covering the acts of omissions and the limits available under Coverage B are reduced by the amount of such other insurance coverage.*

. . . .

## EXCLUSIONS

This policy does not cover:

. . . .

(j) under Coverage B, any liability of an Insured association, corporation or partnership for an Injury arising out of the rendering of or failure to render professional health care services by a person whose acts or omissions the Insured association, corporation or partnership is legally responsible where such person has other insurance which covers such liability. *Coverage B will be excess of all other valid and collectible insurance covering the acts of omissions and the limits available under Coverage B are reduced by the amount of such other insurance coverage.*

. . . .

## LIMITS OF LIABILITY

. . . .

*The "each occurrence" and "aggregate" limits of liability stated in the Declarations Page of this Policy are deemed to* *apply as one to both Coverages A and B, and they do not apply separately for each coverage;* provided, however, that the limits of liability under Coverage A shall apply separately to each individual Named Insured thereunder.

Physicians Insurance Company, Occurrence Policy at 1–3; Respondent's Exhibit "1" (emphasis added).

■ Petitioners argue that PIC's "shared limits" policy may not be enforced, as written, because the Insurance Department declared "shared limits" professional liability policies null and void in 1994. Rather, Petitioners contend that the PIC policy must be interpreted as providing that coverage needed to comply with the Malpractice Act; that is, providing the requisite separate basic coverage for each, the doctor, and his professional corporation.

On the other hand, the CAT Fund argues that PIC's "shared limits" policy is valid, and by its express terms, the professional corporation neither elected under Section 811, to purchase *separate* basic coverage, nor paid the mandatory surcharge under Section 701. The CAT Fund contends that as a result, the professional corporation is not a participant in the CAT Fund, and, consequently, not entitled to the CAT Fund's layer of excess coverage in the amount of $1,000,000.

This Court notes, as pointed out by Petitioners, the validity of PIC's "shared limits" policy language was the subject of a long, protracted disagreement between the CAT Fund, PIC and the Insurance Department in 1993–1994. Petitioners submit for this Court's consideration over 50 letters and memoranda which set forth the parties' decade old positions.[13]

---

**13.** Petitioners also obtained documents from 1985 which establish that the CAT Fund raised this very issue with regard to a "shared limit" professional liability policy issued by

Physician's Professional Insurance Exchange (PIE). Specifically, in 1985, PIE, a professional liability insurer, sent its insureds an "Important Bulletin" notifying them that PIE,

On April 23, 1993, the CAT Fund formalized the dispute when it submitted a 10 page Report to the Insurance Department on April 23, 1993, and requested the Insurance Department disapprove of PIC's "shared limits" policies because they were "not in conformity with" the mandatory requirements of the Act.[14] The CAT Fund asserted in this Report, and in numerous subsequent letters to the Insurance Department and PIC, that PIC's "shared limits" policies violated the Malpractice Act because, while Section 811 coverage was optional, if the corporation elected to procure professional liability insurance, separate limits of liability were required.[15]

From October 1993 to March 1994, the CAT Fund and PIC attempted unsuccessfully to reach an agreement concerning PIC's policy language. At the request of

with the cooperation and assistance of the Insurance Department, had modified its corporate, partnership and association liability policies. PIE offered its professional corporate insureds the option of purchasing "additional interest insurance" which, in effect, created the same shared limits scenario at issue in this case. The CAT Fund objected to PIE's "additional interest insurance" proposition:

> The option that PIE is seeking is simply not available to professional corporations, associations, etc. What PIE seeks to do is provide coverage for the corporation using the basic insurance limits provide for the health care provider involved. In addition, no Fund coverage would be available. It is quite clear that since each health care provider, other than hospitals, must insure or self-insure his professional liability in the amount of $200,000 per occurrence $600,000 per annual aggregate (see 40 P.S. § 1301.701), that what PIE is attempting to do is have the corporation share basic coverage limits with the health care provider. This could present a situation whereby a corporation could exhaust either partly or wholly a physician's aggregate in contravention of the Act. The physician therefore would not have the correct basic insurance including his aggregate if he was forced to share that coverage with the corporation. Simply stated, the Fund has two major objections to what has been proposed. The first is that PIE is attempting to provide coverage for a corporation but is not in compliance with the Act and Fund Bulletin # 10 by not providing separate limits for the corporation and collecting a surcharge which would entitle the corporation to coverage. Secondly, by attempting to share the basic limits with the health care provider, there is a possibility of a physician's aggregate limits being exhausted prior to

the time that this event would have occurred if the doctor maintained his own separate basic coverage.

February 19, 1985, letter from Thomas J. Judge, Sr. Director of the CAT Fund, to Alexander Bratic, Insurance Commissioner; Exhibit "C" to Petitioners' Motion for Summary Judgment at 12–13.

The Insurance Department agreed with the CAT Fund, and sent a letter to PIE advising it that "each professional corporation which elects to purchase coverage must be given separate basic coverage limits from those of the health care providers employed by the corporation. This practice enables the individual health care provider, and the professional corporation to comply with Sections 701 and 811 of the [Act]." Letter dated March 13, 1985, from Alexander Bratic, Insurance Commissioner to Lawrence McMichael, counsel for PIE; Exhibit "C" to Petitioner's Motion for Summary Judgment at 15.

14. *See* April 23, 1993 Letter from B. Craig Black, Acting Chief Counsel of the CAT Fund to Linda Wells, Chief Counsel of the Insurance Department; Exhibit "C" to Petitioners' Motion for Summary Judgment at 22–32

15. *See e.g.,* Letter June 3, 1993, from B. Craig Black, Acting Chief Counsel of CAT Fund to Arthur McNulty, Assistant Counsel PA Department of Insurance; Exhibit "C" to Petitioners' Motion for Summary Judgment at 36–37; Letter July 1, 1993, from B. Craig Black, Acting Chief Counsel of CAT Fund to Carmen Cocca, President and CEO of PIC; Exhibit "C" to Petitioners' Motion for Summary Judgment at 38–40; Letter August 10, 1993, from B. Craig Black, Acting Chief Counsel of CAT Fund to Arthur McNulty, Assistant Counsel PA Department of Insurance; Exhibit "C" to Petitioners' Motion for Summary Judgment at 41–42.

the CAT Fund, the Insurance Department's Policy Examiner, Richard Wright (Wright), sent a letter dated April 5, 1994, to PIC which disapproved of PIC's forms and "shared limits" policies. The Insurance Department, pursuant to its authority under Section 354 of the Insurance Company Law of 1921,[16] took the position that although a corporation's coverage was optional under Section 811, a separate limit of liability was required under Section 701 for those corporations that elected to obtain professional liability insurance under Section 811. The Insurance Department, accordingly, advised PIC:

> In our February 10, 1994 discussions we discussed the following changes to be made to your policy that would bring it into compliance. *Excluding coverage for the professional corporation for acts of the named insured physician and providing first dollar, separate limits, coverage for professional liability for employees of the corporation whether it is an individual physician's professional corporation or a group of physicians that have incorporated. If this is accomplished, in my opinion this will satisfy Pennsylvania statute ....*
>
> This Department received correspondence from Mr. McNulty that conceded that our efforts to arrive at an amicable solution to this problem have not been successful. Consequently, the only recourse this Department would have is a *formal disapproval of the Physician's*

*Insurance Company policy "limits of liability" section that deems the Coverage A and Coverage B limits of liability to not apply separately for each coverage.*

*Pursuant to the authority granted by Section 354 (40 P.S. § 477b) this portion of your policy is considered to be disapproved.*

Letter dated April 5, 1994 from Wright to PIC; Exhibit "C" to Petitioners' Motion for Summary Judgment at 87–88 (emphasis added).

On April 11, 1994, the Insurance Department again wrote to PIC and informed PIC that it would interpret all then current "shared limits" policies issued by PIC as having the coverage needed to comply with the Malpractice Act:

> The Department would like to also emphasize that *all current insureds who have your policy with the Coverage A and Coverage B limits of insurance restrictions will be interpreted as having that coverage needed to comply with Healthcare Services Malpractice Act. If there is a separate policy to the separate entities as stated, this should present no problem.*

Letter dated April 11, 1994, from Wright to PIC; Exhibit "9" to Respondent's Brief (emphasis added). PIC did not challenge this determination and, after the "shared limits" policy language was disapproved by the Insurance Department, it was never thereafter approved.[17]

---

16. Section 354 of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended*, 40 P.S. § 477b, added by Section 2 of the Act of June 23, 1931, P.L. 904 provides: "It shall be unlawful for any insurance company ... to issue, sell, or dispose of any policy, contract, or certificate, covering life, health, accident, personal liability, fire, marine, title, and all forms of casualty insurance, ... until the forms of the same have been submitted to and formally approved by the Insurance Commissioner...."

17. On September 23, 1994, PIC submitted its new policy forms to the Insurance Department for review and approval. *See* Letter dated September 23, 1994, from Mary Burns of PIC to Wright; Exhibit "C" to Petitioners' Motion for Summary Judgment at 115. PIC's amended occurrence policy for corporations was approved by the Insurance Department effective 10/5/94. *See* Letter dated November 10, 1994 to Wright from PIC, with stamp of approval by Department; Exhibit "C" to Petitioners' Motion for Summary Judgment at 132. This Court is not aware of, and neither

Our Supreme Court has stated:

It is well settled that when the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation. Thus, our courts will not disturb administrative discretion in interpreting legislation within an agency's own sphere of expertise absent fraud, bad faith, abuse of discretion or clearly arbitrary action.

*Winslow-Quattlebaum v. Maryland Insurance Group,* 561 Pa. 629, 634, 752 A.2d 878, 881 (2000) (citations omitted).

The Insurance Department is specifically delegated the responsibility to regulate the insurance industry, including carrying out the objectives of the Malpractice Act.[18] Pursuant to that authority, the Insurance Department found PIC's "shared limits" policy language violated the Malpractice Act's requirement that the professional corporation maintain separate basic liability coverage.

As noted in Section 102 of the Act, the purpose of the Malpractice Act was to provide reasonably priced professional malpractice insurance to health care providers in the Commonwealth; and to insure that injured patients obtain prompt and fair compensation for *bona fide* claims. 40 P.S. § 1301.102. The Insurance Department's disapproval of the "shared limits" language in PIC's policy which, in effect, rendered professional liability coverage to the corporation illusory and/or non-existent, was consistent with that stated purpose. Deferring to the Insurance Department's expertise in promoting the purposes of the Malpractice Act, this Court agrees with the Insurance Depart-

ment's interpretation of Section 701(e) of the Malpractice Act, 40 P.S. § 1301.701(e), which contemplates separate, independent, layers of primary basic coverage.

■ Accordingly, this Court finds that Dr. Hurwitz's professional corporation had the necessary coverage to comply with Healthcare Services Malpractice Act. This Court agrees that PIC's "shared limits" policy is invalid, and the CAT Fund was without justification to rely on this language as a ruse to refuse to provide excess coverage on behalf of Dr. Hurwitz's professional corporation.

■ Contrary to the CAT Fund's argument, the CAT Fund's failure to collect a surcharge from the professional corporation, under the unique facts of this case, does not, in and of itself, render the professional corporation ineligible for $1 million excess coverage by the CAT Fund. The record shows that the CAT Fund was privy to the communications between PIC and the Insurance Department and was aware of the Insurance Department's disapproval of the PIC "shared limits" policy language. The CAT Fund was also aware that PIC did not charge a premium for its corporate "shared limits" policies. Carole Strickland (Strickland), the Claims Manager of the CAT Fund, testified that when PIC sold its corporate "shared limit" policies for "zero premium," the CAT Fund would collect *no* surcharge on behalf of the corporation and admitted "there was nothing the Fund could do about it in those days." Deposition of Carole Strickland, August 21, 2002, at 92–93; Exhibit "E" to Petitioners' Motion for Summary Judgment. Strickland further admitted there were situations where a professional corporation that paid no surcharge, neverthe-

---

party has pointed us to, any other case or instance where the "shared limits" language was thereafter utilized by any other professional liability insurer.

18. Section 354 of the Insurance Company Law, 40 P.S. § 477b; and Section 804 of the Malpractice Act, formerly 40 P.S. § 1301.804.

less, enjoyed a layer of coverage with the CAT Fund under Section 605.[19]

■ Section 605 provides that claims made more than four years after the malpractice has occurred "*shall be defended and paid by the fund.*" Consistent with Section 605 and Strickland's testimony, the CAT Fund assumed total control of the defense of both Dr. Hurwitz *and his professional corporation* even though it had not collected a surcharge from the professional corporation. Again, the CAT Fund's present position is totally inconsistent with its conduct. In *Malley v. American Indemnity Co.*, 297 Pa. 216, 146 A. 571 (1929), our Supreme Court held that once an insurer takes charge of a defense of an action, it will be estopped to later deny liability on the grounds that the claim was not covered by the terms of the policy. The Court reasoned:

> Where an insurance company, under an indemnity contract, takes charge of the defense of an action on which liability rests, it will be estopped from thereafter questioning the claim either because it was beyond the terms of the policy or because the latter was procured by a breach of some warranty. . . . It cannot play fast and loose, taking a chance in the hope of winning, and, if the results are adverse, take advantage of a defect in the policy. The insured loses substantial rights when he surrenders, as he must, to the insurance carrier the conduct of the case.

*Malley*, 297 Pa. at 221, 146 A. at 572.

In this case, when the CAT Fund assumed the defense of Dr. Hurwitz and his

corporation, it substituted its judgment for that of the defendants. While the CAT Fund is not an "insurance company," this Court believes that the Supreme Court's rationale in *Malley* applies here to estop the CAT Fund from now claiming, after the suit was tried, that the CAT Fund has no duty to indemnify the professional corporation because it was not a participant in the CAT Fund.

Lastly, Petitioners submitted evidence of at least three other cases where, consistent with Strickland's testimony, the CAT Fund paid the $1 million excess layer of coverage on behalf of the professional corporation, despite the existence of "shared limits" language in those policies, and despite the fact that no surcharge had been collected from the professional corporation. *See* Exhibit "D" to Petitioners' Motion for Summary Judgment. Other than its assertion that it should not be ordered to "violate its Act" just because it did so in these prior cases, the CAT Fund has provided no sound reason why this case should be treated any differently than these other cases. In light of this Court's conclusion that the *corporation's policy* should be interpreted as having that coverage needed to comply with Healthcare Services Malpractice Act, the CAT Fund is not being "forced to violate the law," by paying the excess layer of coverage on behalf of Dr. Hurwitz's professional corporation.[20]

■ Based upon the foregoing discussion, we grant the Petitioners' application for summary judgment and deny the CAT Fund's application for summary judgment.[21]

---

19. Deposition of Carole Strickland, August 6, 2002, at 56, 58–59; Exhibit "E" to Petitioners' Motion for Summary Judgment.

20. Based on this Court's holding that the "shared limits" policy violates the Malpractice Act, this Court need not address Petitioners' estoppel or equal protection arguments.

21. This Court agrees with Petitioners that the CAT Fund improperly cited and quoted from an unpublished opinion of this court; *Martin v. Fund*, Docket No. 721 M.D.1999; accordingly, all references to that opinion made in CAT Fund's Brief are struck and any arguments advanced by the CAT Fund based solely on that opinion will not be considered. *Meier*

## ORDER

AND NOW, this 1st day of July, 2004, Petitioners' Motion for Summary Judgment is GRANTED and the CAT Fund's Cross–Motion for Summary Judgment is DENIED.

*v. Maleski,* 167 Pa.Cmwlth. 458, 648 A.2d 595    (1994).